**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| UZODINMA UGOALA, on Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> REGENT, L.P., INTERNATIONAL DATA GROUP, INC., and FOUNDRY, <br><br> Defendants. | Case No.: <br><br> **CLASS ACTION COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Uzodinma Ugoala ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this class action complaint against Defendants Regent, L.P., International Data Group, Inc. ("IDG"), and Foundry (collectively "Foundry" or the "Defendants"), which manage a number of computer related publications (the "Websites").[1] On the Websites, Defendants utilized tracking tools to intercept and disclose consumers' search

---

[1] Upon information and belief, the Websites at issue include: https://www.cio.com/, https://computerworld.com/, https://www.csoonline.com/, https://www.infoworld.com/, https://www.macworld.com/, https://www.networkworld.com/, https://www.pcworld.com/, https://www.techadvisor.com/, https://www.techhive.com/ (collectively, the "Websites") (the websites are individually referred to as a "Website"). *See also Our Brands*, FOUNDRY, https://foundryco.com/our-brands/ (last visited Feb. 26, 2025).

terms, video watching information (via query string parameters, detailed URLs, and metadata), and identifiable information (collectively "Sensitive Information") without seeking or obtaining consumers' consent (collectively, the "Tracking Tools"). The Websites' use of the Tracking Tools resulted in violations of the Video Privacy Protection Act (VPPA), state and federal wiretap statutes, and invasions into consumers' privacy. Plaintiff alleges the following upon information and belief based on the investigation of counsel, except for those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. This is a class action brought on behalf of all persons who streamed videos on the Websites operated by Defendants, and (i) purchased subscriptions to the Websites' magazines, or (ii) signed up to the Websites' e-newsletters.

2. The Websites allow visitors to use the Websites' built-in search bar to search for videos by typing search terms into a search bar ("Visitors"). Individuals also have the ability to sign up to the Websites' e-newsletters by providing their personal information in exchange for newsletters or by paying money to gain access

to pay-walled Digital Magazines[2] (the "Subscribers", collectively with Visitors, "Users").

3.    Videos are embedded within articles provided on the Websites, and as stand-alone content throughout the Websites, providing advice on various aspects of tech products and services.

4.    The videos on the Websites are monetized via ads that Subscribers must view before and while Subscribers watch videos. In short, Defendants are in the business of providing pre-recorded videos to Subscribers.

5.    Defendants do not disclose on the Websites that Users' Sensitive Information ("PII")[3] would be captured by Tracking Tools utilized by Defendants, and then transferred to third parties.

6.    In today's data driven world, data sharing policies for a service or subscription is an important factor for individuals deciding whether to provide personal information to that service.

---

[2] https://www.macworld.com/, https://www.pcworld.com/, and https://www.techadvisor.com/ offer paid subscriptions to their Digital Magazine.

[3] PII encompasses information able to identify users, as well as the title, description, or summary of video materials or services requested or obtained from a video tape service provider. *See* 18 U.S.C. § 2710(a)(3).

7.      Congress has recognized the immediate and irreversible harm caused by associating a person's personally identifiable information in conjunction with a list of specific audio visual materials they have requested or consumed.

8.      The Video Privacy Protection Act ("VPPA") prohibits video tape service providers,[4] such as Defendants, from sharing PII. Under the VPPA, PII is information that can specifically tie the identity of an individual to the individual's requested pre-recorded audio video material, either through the title, description, or summary of the video content.[5]

9.      Congress made clear that harm to an individual impacted by a VPPA violation occurs the moment, and each time, a consumer's information is shared.

10.      Defendants purposefully implemented and utilized Meta, Inc.'s ("Facebook" or "Meta") tracking pixel (the "Pixel," discussed and defined herein) to tracks user activity on the Websites and disclose that information to Facebook to gather valuable marketing data. The Pixel cannot be placed on a Website without steps taken directly by Defendants or on behalf of Defendants (e.g., by a website

---

[4] 18 U.S.C. § 2710(a)(4).
[5] 18 U.S.C. § 2710(b)(2)(D)(II).

manager).  The Pixel cannot be placed on the Websites by Facebook without the knowledge and cooperation of Defendants.

11.    As evidenced by their Pixel IDs, Defendants implemented the same Pixels across the Websites to track Users' activities on the Websites.

12.    Defendants do not seek, and have not obtained, consent from Subscribers to utilize the Pixel to track, share, and exchange their PII with Facebook.

13.    Defendants knew that their Pixel resulted in Users' PII and search terms being shared (resulting in VPPA and Wiretap Act violations), and that it failed to obtain Users' consent to allow their Pixel to operate in a way that shares their protected information with Facebook.

14.    Federal legislatures addressed citizens privacy expectations when communicating with parties over wired communications.

15.    Congress passed the Wiretap Act, which prohibits the unauthorized interception of electronic communications.

16.    Defendants purposefully implemented and utilized the Pixel to intercept and read the search terms and disclose the location and content of webpages visited by Users.

5

17. Users of the Websites, such as Plaintiff, have an interest in maintaining control over their private and sensitive information, such as their PII and search terms, as well as an interest in preventing their misuse.

18. Users of the Websites have been harmed as a result of Defendants' violations of the VPPA, state and federal wiretap laws, and had their privacy invaded. In addition to monetary damages, Plaintiff seeks injunctive relief requiring Defendants to immediately (i) remove the Tracking Tools from the Websites, or (ii) add, and obtain, the appropriate consent from Users; or (iii) otherwise anonymize video titles in URLs, parameters, and metadata and/or hash Users' Facebook user IDs ("FIDs") in the Pixel transmissions.

19. Plaintiff's claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of himself and all other similarly situated persons. Plaintiff seeks relief in this action individually and on behalf of Users of the Websites for violations of the VPPA and the Wiretap Act.

20. Defendants violated the VPPA the moment, and each time, Plaintiff and Class Members streamed any video on the Websites, signed up to the Websites' Newsletters, or purchased a subscription to a Website's Digital Magazine and had their PII shared.

21. Defendants violated the Wiretap Act the moment, and each time, Plaintiff and Class Members streamed any video on the Websites, signed up to the Websites' Newsletters, or purchased a subscription to a Digital Magazine.

## PARTIES

*Plaintiff Ugoala*

22. Plaintiff Uzodinma Ugoala is a citizen of Georgia residing in Norcross, Georgia. Plaintiff Ugoala subscribed to Defendants' PCWorld Website in 2020 and to Defendants' MacWorld Website for its newsletters in 2015. Plaintiff Ugoala used the PCWorld and Macworld Websites to access video content comparing laptops and computers with better intel, gaming computers, and do-it-yourself videos about computers.

23. By interacting with Defendants' Websites, Plaintiff Ugoala's Sensitive Information was disclosed to third parties, including Meta, through Defendants' placement of Tracking Tools, including the Pixel, on the webpages he visited on Defendants' Websites. These webpages include but are not limited to the webpages for the search engine, the specific videos he watched, and the webpage through which Plaintiff Ugoala subscribed to the PCWorld and Macworld Websites.

24. Plaintiff Ugoala had an active Facebook account at the time of his interactions with Defendants' PCWorld and Macworld Websites. The Sensitive Information disclosed to third parties included but is not limited to Plaintiff Ugoala's search terms, the titles or descriptions of videos he watched, and his

unique Facebook ID. Shortly after visiting the PCWorld and Macworld Websites to view video content, Plaintiff Ugoala began to receive unsolicited advertisements relating to technology and computers.

25.     Plaintiff Ugoala saw nothing on the PCWorld and Macworld Websites that suggested to him that his Sensitive Information would be disclosed to unauthorized third parties and did not authorize, consent to, or otherwise engage or permit the disclosure of his Sensitive Information to Meta or any third party. Plaintiff Ugoala would not have used the PCWorld and Macworld Websites to access tech advice had he known that his Sensitive Information would be disclosed to unauthorized third parties.

### *Defendants*

26.     Defendant Regent, L.P. is a multi-sector private equity firm based in Beverly Hills, California. Regent specializes in complex corporate divestitures, having acquired over thirty businesses since 2015.[6] On March 20, 2025, Regent acquired Foundry from IDG.[7]

27.     Defendant International Data Group, Inc. (IDG)[8] is a premier global provider of market intelligence, advisory services, and events for the information technology, telecom, and consumer tech markets based in Needham, Massachusetts.

---

[6] *Home*, REGENT, https://www.regentlp.com/ (last visited Mar. 26, 2025).
[7] *Blackstone-backed IDG Completes Sale of Foundry to Regent*, REGENT (Mar. 20, 2025), https://www.regentlp.com/news/regent-lp-acquires-crossknowledge-from-wiley-4682y.
[8] On December 16, 2024, Plaintiff's Counsel sent IDG and Foundry a pre-suit notice letter, outlining the allegations described herein. Plaintiff's Counsel and IDG's Counsel has since been engaged in discussions towards a pre-suit resolution, until Foundry's sale to Regent on March 20, 2025.

28.    Defendant Foundry (formerly known as IDG Communications, Inc.) is a global provider of media and event services, marketing technology, and intent data for business-to-business technology marketers based in Needham, Massachusetts.

## JURISDICTION AND VENUE

29.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendants.

30.    This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiff's claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* and the Federal Wiretap Act, 18 U.S.C. § 2511(1) (a)-(e).

31.    This Court has personal jurisdiction over Defendants because Defendants derive revenue in the State of Georgia, including Defendants' revenue generated from its management and operational control over the Websites, as well as the revenue sharing, advertising sales, etc. that Defendants derive from the Websites. Defendants further do business and derive sales within the state of Georgia. Defendants' collection and dissemination of Plaintiff's personally identifiable information giving rise to this lawsuit occurred in this District, and the

9

conduct giving rise to this action arose out of and relates to conduct and business in this District.

32.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants conduct substantial business operations in this District, including managing the Websites, delivering video content, and Defendants' U.S.-based marketing.

## FACTUAL BACKGROUND

### I.    The VPPA

33.    The VPPA was first conceived because of an incident stemming from President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a reporter requested Judge Bork's movie rental history from a movie rental establishment. The employee disclosed to Judge Bork's movie rental history to the Washington City Paper, which then published that history. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of

computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

34.    Senators were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audio visual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

35.    In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

36.    During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator

11

Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[9]

37.    The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

38.    The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

39.    A video tape service provider ("VTSP") is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. §

---

[9] See *Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited on Feb. 26, 2025).

2710(a)(4). A consumer is "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1).

40.    The VPPA also prohibits the disclosure of PII which identifies the title or description of the audio visual material for marketing goods and services. 18 U.S.C. § 2710(b)(2)(D)(ii).

41.    VTSPs may obtain consent from consumers to disclose information where that consent: (1) is in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer (18 U.S.C. § 2710(b)(2)(B)(i)); (2) at the election of the consumer in advance of up to 2 years or when the disclosure is sought (18 U.S.C. § 2710(b)(2)(B)(ii)); and (3) if the VTSP provided the consumer with a clear and conspicuous opportunity to withdraw consent on a case-by-case basis or withdraw from ongoing disclosures at the consumer's election (18 U.S.C. § 2710(b)(2)(B)(iii)).

42.    Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

13

43.    Defendants here are video service providers in that it sold or provided access to pre-recorded audio visual materials to Users, including Plaintiff and Class Members, on their Websites.

44.    The relationship between Plaintiff and Defendants is precisely the type of relationship contemplated by the VPPA.

45.    In this case, Defendants knowingly and systematically disclosed Plaintiff's PII to Meta, without obtaining his consent, by purposely placing the Pixel on the Websites with the knowledge it would collect user information.

## II.    The Federal Wiretap Act

46.    The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[10]

47.    The Wiretap Act primarily concerned the government's use of wiretaps but was amended in 1986 through the Electronic Communications Privacy Act

---

[10] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022) https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1541&context=crsj    (last visited Feb. 26, 2025).

("ECPA") to provide a private right of action for private intrusions as though they were government intrusions.[11]

48.    Congress was concerned that technological advancements like "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing"[12] were rendering the Wiretap Act out-of-date. Congress amended the Wiretap Act in 1986 through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions.[13]

49.    As a result, the ECPA primarily focused on two types of computer services that were prominent in the 1980s: (i) electronic communications like email between users; and (ii) remote computing services like cloud storage or third party processing of data and files.[14]

50.    Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person or entity: (i) provides an electronic communication service to the public; and (ii) intentionally divulges the contents of any communication; (iii)

---

[11] *Id.*
[12] Senate Rep. No. 99-541, at 2 (1986).
[13] Driscoll, *supra* note 12.
[14] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).

15

while the communication is being transmitted on that service; (iv) to any person or entity other than the intended recipient of such communication.

51.     While the ECPA allows a single party to consent to the interception of an electronic communication, single party consent is only acceptable where the communication is not "intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. §2511(2)(d).

52.     While communicating with Defendants on the Websites, Users had the contents[15] of their communications with Defendants intercepted by Meta via the Pixel.

53.     Defendants purposefully included the Tracking Tools on the Websites to intercept Plaintiff's communications and redirect them to third parties to improve the effectiveness of its advertising and marketing.

54.     Plaintiff did not know of or consent to the exposure of his legally protected communications with Defendants to Meta.

---

[15] The contents of Plaintiff's and users' communications include: 1) search terms submitted to the site; 2) the location and contents of webpages visited by users; and 3) the PII discussed in Section IV.

55.    Defendants acted with the intent to have Plaintiff's communications intercepted by third parties to use Users' protected, private information for their economic benefit through monetizing the information via targeted advertising and other means.

## III.    How Websites Function

56.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

57.    Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[16]

58.    Each webpage has a unique address, and two webpages cannot be stored at the same address.[17]

---

[16] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Feb. 26, 2025).
[17] *Id.*

59.    When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[18]

60.    An IP address is "a unique address that identifies a device on the internet or a local network."[19] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.

*Id.*

61.    When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address. This request is for the specific resource located at the URL. If the server fulfils this request, it issues an HTTP response, which includes the status of the request and, typically, the

---

[18]    *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Feb. 26, 2025).
[19]    *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Feb. 26, 2025).

18

requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[20]

62.    This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

63.    The Request URL typically contains parameters.  Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[21] as depicted below:



*Figure 1 - Mozilla's diagram of a URL, including parameters*[22]

---

[20] *Id.*

[21] To see examples of how the Websites used parameters to provide additional information here, *see, infra,* Section IV.

[22]    *What    is    a    URL?*,    MOZILLA,    https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 26, 2025).

64.     The user's browser then assembles the small chunks back into HTML, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML code.[23]  This is the visible, and usually interactable, website that most people think of.

65.     To provide more complex website functionalities, website developers will include more complex commands written in other computer programming languages such as JavaScript snippets within the HTML documents.[24]

66.     Such complex tasks include streaming videos by the Users or subscribing to Newsletters/ Digital Magazine, or code used to monitor and report user activity.

IV.     **PCWorld, by way of example, and the Tracking Tools**

67.     On the Websites, Defendants utilized Tracking Tools, including those created by Facebook, Google, and others (collectively, the "Tracking Entities"), to intercept and disclose Users' Sensitive Information without seeking or obtaining Users' consent.

---

[23] *Id.*

[24]     *See    JavaScript    Basics*,    MOZILLA,    https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 26, 2025).

68.    Defendants' control over implementing the Tracking Tools on each of the Websites is evidenced by the code on the Websites.

69.    For example, the code from the Pixel initiating on the PCWorld Website is identical to the code from the Pixel initiating on the MacWorld Website.

*Figure 22 – Code on the PCWorld Website from the Pixel initiating*

*Figure 33 – Code on the MacWorld Website from the Pixel initiating*

21

70.    Additionally, both the PCWorld Website and the MacWorld Website utilize two Pixels identifiable by their identical Pixel IDs.



*Figure 44 – Pixel transmission from visiting the PCWorld homepage, showing Pixel ID "528995260596026"*



*Figure 55 – Pixel transmission from visiting the MacWorld homepage, showing Pixel ID "528995260596026"*



*Figure 66 – Pixel transmission from visiting the PCWorld homepage, showing Pixel ID "783301121827721"*



*Figure 77 – Pixel transmission from visiting the MacWorld homepage, showing Pixel ID "783301121827721"*

71.    Accordingly, for purposes of this Complaint, the evidence that follows relates to the PCWorld Website, but as shown, may apply to the Websites generally.

**A. The Facebook Tracking Pixel**

72.    Boasting 2.9 billion monthly active users, Facebook is the largest social networking site on the planet.[25] Facebook is a "real identity platform,"[26] meaning users are allowed only one account and must share "the name they go by

---

[25] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html (last visited Feb. 26, 2025).

[26] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021 4:05 PM). https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701 (last visited Feb. 26, 2025).

in everyday life."[27] To meet that goal, Facebook requires users, when creating an account, to provide their first and last name, along with their birthday and gender.[28]

73.    Facebook monetizes users by selling advertisers access to their Facebook feeds.[29]

74.    Facebook's advertising capabilities are valuable because of its ability to effectively target users with meaningful or relevant advertising.[30] Facebook can target users so effectively because it monitors and analyzes user activity both on and off its site.[31] This allows Facebook to infer details about users beyond what users explicitly disclose, like their "location, demographics, interests and behaviors."[32] Facebook compiles this information into a generalized dataset called

---

[27] *Community Standards, Part IV Integrity and Authenticity*, FACEBOOK, https://www.facebook.com/communitystandards/integrity_authenticity (last visited Feb. 26, 2025).

[28] *Sign Up*, FACEBOOK, https://www.facebook.com/ (last visited Feb. 26, 2025).

[29] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html (last visited Feb. 26, 2025).

[30] *See Why advertise on Facebook, Instagram and other Meta technologies*, FACEBOOK, https://www.facebook.com/business/help/205029060038706 (last visited Feb. 27, 2025).

[31] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Feb. 26, 2025).

[32] *Audience Ad Targeting: How to find people most likely to respond to your ad,* FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 26, 2025).

"Core Audiences," which advertisers can sort through using highly specific filters and parameters to make sure their targeted advertisements are aimed at users likely to positively respond.[33]

75.    Advertisers can build "Custom Audiences,"[34] which enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[35] Meta's Custom Audience feature enables the direct targeting of existing customers and to build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[36] Unlike Core Audiences, Custom Audiences require an advertiser to supply users' data to Facebook. Advertisers can do so through two mechanisms: by manually uploading contact information for customers

---

[33] *Easier, More Effective Ways to Reach the Right People on Facebook*, FACEBOOK, https://www.facebook.com/business/news/Core-Audiences (last visited Feb. 26, 2025).

[34]    *About    Custom    Audiences*,    FACEBOOK, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited Feb. 26, 2025).

[35]    *About    Events    Custom    Audience*,    FACEBOOK, https://www.facebook.com/business/help/366151833804507?id=300360584271273 (last visited Feb. 26, 2025).

[36]    *About    Lookalike    Audiences*,    FACEBOOK, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited Feb. 26, 2025).

in the form of "lists," or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[37]

76.     Here, Defendants employ both methods of supplying user information to Meta.

77.     Meta's "Business Tools" allow web developers to monitor user interactions on their websites, which can then be shared with Meta. For example, Meta offers a tracking Pixel (the "Pixel") and the Conversions API. Where "the Pixel lets you share web events from a web browser[,] . . . the Conversions API lets you share web events directly from your server."[38]

78.     The Pixel is a piece of code that advertisers, like Defendants, can integrate into their website. Once activated, the Pixel "tracks the people and type of actions they take."[39] When the Pixel captures an action, it sends a record of the

---

[37]     *Create a Customer List Custom Audience*, FACEBOOK, https://www.facebook.com/business/help/170456843145568?id=2469097953376494 (last visited Feb. 26, 2025); *Create a Website Custom Audience*, FACEBOOK, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last visited Feb. 26, 2025).

[38] *Business Help Center: About deduplication for Meta Pixel and Conversions API events*, FACEBOOK, https://www.facebook.com/business/help/823677331451951?id=1205376682832142 (last visited Feb. 26, 2025).

[39] *Retargeting*, FACEBOOK, https://www.facebook.com/business/goals/retargeting (last visited Feb. 26, 2025).

action to Facebook. After receiving the Pixel transmission sent by an advertiser, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

79.    After processing the data, Meta also makes much of the data available to the advertisers through the "Event Manager" tool.[40]

80.    However, to make use of the Pixel, Defendants must first agree to the Meta Business Tools Terms.

81.    The Meta Business Tools Terms directly inform Pixel users how the Pixel operates.

82.    Meta explicitly informs Pixel users that using the Pixel will result in Facebook receiving users' information "that personally identifies [them] . . . " ("Contact Information") and information "about [users] and the actions they take on your websites . . ." ("Event Data").[41] The terms also warn website developers

---

[40]        *About Meta Events Manager*, FACEBOOK, https://www.facebook.com/business/help/898185560232180?id=1205376682832142 (last visited Feb. 26, 2025).

[41]        *Meta Business Tools Terms*, Section *1(a)(i)-(ii)*, FACEBOOK, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY4CZdRHnQNL2-VtXBCcMUcg-6J-5jU8AL4hOLViKhAWi-SbNmA4QuXlc6yyk877eY&_rdr (last visited Feb. 26, 2025).

27

that Facebook will "process the Contact Information solely to match the Contact Information against" FIDs, "as well as to combine those [FIDs] with corresponding Event Data."[42]

83.    Meta also requires Pixel users to "represent and warrant that [they] . . . have all the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data."[43]

84.    Additionally, Meta requires Pixel users to "represent and warrant that [they] will not share Business Tool Data with [Meta] that . . . includes . . . categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)." [44]

85.    In short, Meta explicitly explains that the Pixel combines users' identifying information with their activity on websites to build marketing profiles and, as a result, that websites should not share sensitive information using the Pixel.

---

[42] *Id.* at Section 2(a)(i)(1).
[43] *Id.* at Section 1(e).
[44] *Id.* at Section 1(h).

28

86.     Despite Meta's warnings, advertisers ultimately have control over what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will be active for on websites. These events, in turn, determine what data is collected, including the website's query string parameters, metadata, and what pages a visitor views.[45]

87.     Advertisers can also configure the Facebook Tracking Pixel to track events other than Meta's menu of "standard events," which contain events that can track what content a visitor views or purchases.[46] An advertiser can also create their own "custom events," allowing them to track designated user activity and data through events programmed specifically for that purpose on advertiser's website.[47]

---

[45] *See Advanced*, FACEBOOK, https://developers.facebook.com/docs/facebook-pixel/advanced/ (last visited Feb. 26, 2025); *see also Best Practices for Meta Pixel Setup*, FACEBOOK, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last visited Feb. 26, 2025).

[46] *Specifications for Meta Pixel Standard Events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Feb. 26, 2025).

[47] *About Standard and Custom Website Events*, FACEBOOK, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last visited Feb. 26, 2025).

88.     Advertisers also control how the Facebook Tracking Pixel identifies visitors. The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel- specific Data."[48]

89.     HTTP Headers include "IP addresses, information about the web browser, page location, document, referrer and data potentially identifying persons using the website."[49]

90.     Pixel-specific Data includes "the Pixel ID and cookie[s],"[50] which can also identify persons using the website.

91.     Once a Pixel activates, it copies relevant information from the communication between the user and website, such as URLs, user activity, search terms, metadata, query string parameters, and cookies, bundles that information together, and transmits that copied bundle to Meta through a "GET" or "POST" HTTP request.

92.     Akin to each of the Websites, the PCWorld Website implements the Pixel.

---

[48] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/facebook-pixel/ (last visited Feb. 26, 2025).
[49] *Id.*
[50] *Id.*

93.     The PCWorld Website allows users to stream videos, subscribe to its Newsletter in exchange of email address and purchase a yearly subscription to its Digital Magazine.

94.     PCWorld gives Users access to Newsletters, which allows them to choose from: 1) Top Stories @PCWorld, which provides a "round-up of breaking tech news, newest product reviews and latest how-to guides, every weekday"; 2) PCWorld Deals, which provides "the hottest deals and latest discounts on tech products, every weekday"; and 3) Power Tips, which provides "[t]ips, tricks and advice on how to get the most from your PC" every Tuesday. The subscription to the Websites' Digital Magazine allows Users to purchase a yearly subscription costing $19.97 and a two year subscription costing $34.97.

95.     Defendants added the Pixel to PCWorld's Website, which it uses to track customers throughout their use of the Website and through the purchased subscription process. When a user searches for any video, for example, Defendants disclose data via the PageView event.



*Figure 88 - Sample search on the PCWorld Website using search terms "GPU Battle"*

96.    PageView data discloses what videos a user has searched.



*Figure 99 - Pixel transmission containing search terms entered by users*

97. When a consumer clicks on the searched video, another PageView event is triggered, transmitting the video's title.



*Figure 4 - Webpage resulting from click-on search result, including video title.*



*Figure 10 – ViewContent Event transmission caused by watching a video on the article, including video title*

98.     Defendants also use the "View Content" events to transmit the title, description, or, summary of pre-recorded videos on the Websites.



*Figure 11 - PageView event transmission caused by watching a video on the article, including video title*

99.     Defendants offer the Subscribers a subscription to their yearly Digital Magazine. To subscribe, a subscriber must proceed to payment.

100.    The event data disclosed by Defendants permits an ordinary person to identify the signed-up Newsletter or purchased subscription to the Digital Magazine. When a Subscriber watches pre-recorded video on the Website while logged into Facebook, PCWorld compels a visitor's browser to transmit to

Facebook the c_user cookie, which contains that visitor's unencrypted Facebook ID (the "FID").



*Figure 12 - Cookies attached to Pixel transmission*

101.    Facebook, at a minimum, uses the c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

102.    An FID is personally identifiable information. It contains a series of numbers used to identify a specific profile, as depicted below:

36

c_user=100091959850832;

*Figure 13 - Sample c_user ID number of test account created to investigate the Pixel, captured by a Pixel event from a previous investigation*

103. A FID can be used by anyone to easily identify a Facebook user by simply appending the FID to www.facebook.com (e.g., www.facebook.com/[FID_here]).

104. Using the FID from *Figure 13*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will



redirect the webpage straight to the Facebook profile associated with the FID, as depicted below:

*Figure 14 - Appending FID of a user to "facebook.com/" results in the user being redirected to the user's profile*

105.   Importantly, some Facebook profile information – name, gender, profile photo, cover photo, username, user ID (account number), age range, language and country – are "always public."[51] No privacy setting on a Facebook account would allow Plaintiff, or any users, to hide this basic information.

106.   By compelling a Subscriber's browser to disclose the c_user cookie alongside event data for video watching, Defendants knowingly disclose information sufficiently permitting an ordinary person to identify what video a specific individual has streamed.

107.   Defendants also upload customer lists to Meta that contain Subscribers' email addresses and purchase information, including what videos they streamed or what subscription they purchased. Defendants upload these lists to Meta so that Meta can match Subscribers to their Facebook profiles.

---

[51]   *Control who can see what you share on Facebook*, FACEBOOK, https://www.facebook.com/help/1297502253597210 (last visited Feb. 26, 2025).

108.    Meta admits that "[advertisers] provide us with information about [their] existing customers and we match this information with Facebook profiles."[52] The customer lists must contain "'identifier[s]' (such as email, phone number, address)"[53] so that Meta can match the lists to "Facebook profiles" and "[advertisers] can advertise to [their] customers on Facebook, Instagram and Audience Network."[54]

109.    Defendants also combine these customer lists with offline event data to effectively target PII Users. When advertisers create an ad campaign, Meta will "match the offline data [advertisers] upload to the event set so that [advertisers] can see how much [their] ads resulted in offline activity."[55] Meta also recommends that advertisers, like Defendants, provide an accurate timestamp for each event, down to "the minute or second."

---

[52]    *Create a Customer Audience List*, FACEBOOK, https://www.facebook.com/business/help/170456843145568?id=2469097953376494&helpref=search&sr=1&query=customer%20audience%20list (last visited Feb. 26, 2025).
[53] *Id.*
[54]    *About customer list custom audiences*, FACEBOOK, https://www.facebook.com/business/help/341425252616329?id=2469097953376494 (last visited Feb. 27, 2025).
[55]    *Upload Offline Event Data*, FACEBOOK, HTTPS://WWW.FACEBOOK.COM/BUSINESS/HELP/155437961572700?ID=56590011044754 (last visited Feb. 26, 2025).

110.    Defendants uploaded customer lists and offline events so they can match a Users' video stream searches, requests and subscriptions, with their corresponding Facebook profile.

## B. The Google Tracking Tools

111.    Google has an array of advertising products, each serving a specific function in advertising portfolios.

### 1. *Google Ads*

112.    One product, Google Ads (formerly AdWords), is an advertising platform developed by Google, that allows advertisers to place bids to display advertisements, service offerings, product listings, or videos to web users.[56]

113.    The process advertisers using Google Ads to display ads within text-based search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results;[57]

---

[56]*Achieve all your goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited Feb. 26, 2025).
[57]    *Reach    the    right    people    with    Search    Ads*,    GOOGLE    ADS, https://ads.google.com/home/campaigns/search-ads/ (last visitedFeb. 26, 2025).

(iii) Google then allows advertisers to bid on those various keywords;[58] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

114.    Google AdSense, works in conjunction with the Google Ads bidding system, allowing website owners to show Google Ads on websites and earn a revenue share from each ad each time it is viewed or clicked on their own sites.[59] The search terms that various entities bid for through Google Ads are then used by websites owners using Google AdSense to allow  website owners to share in the profit Google generates from the advertising.

115.    AdSense for content or AdSense for search are methods by which AdSense functions.[60] In either case, AdSense allows the website host to match ads to the website users based on the website's content and visitors.

116.    Google Ads intercepted Plaintiff's search terms, as depicted below.

---

[58] *Id.*

[59] *Home*, GOOGLE ADSENSE, https://www.google.com/adsense/start/how-it-works/ (last visited Feb. 26, 2025).

[60]    *AdSense revenue share*, GOOGLE ADSENSE REVENUE, https://support.google.com/adsense/answer/180195?hl=en (last visited Feb. 26, 2025).



*Figure 15 – Test search made on the PCWorld Website resulted in Request sharing Search Terms "GPU Battle" with Google Page Ads*

117.    Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

118.    Through Google AdSense, Google derives benefits from the ability to aggregate the search data it collects from website users to improve its own services and provide more relevant search results. By understanding patterns and trends in user behavior, Google better understands and gains unencumbered insight into what users are searching for and what they are interested in, which helps Google improve its own services, develop new products and overall increase revenues.

119.   Google's collection and analysis of search results also allows it to improve its machine learning algorithms.[61] Google uses data on how users interact with search results to train its algorithms to provide more accurate and relevant search results.[62] For example, if a user clicks on a particular search result and spends more time on that page, Google learns that this page is likely more relevant to that search query.  By gathering this vast array of data on all users, Google can build an advertising portfolio for each user which includes their gender, age, job industry, and interests.[63]

120.   Google profits in several ways from the Website's use of the Google search engine: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense search, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user search data allows them to further tailor their own products to advertisers and users alike by training its algorithms with vast amounts of search data.

---

[61] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited Feb. 26, 2025).
[62] *Id*.
[63] *Id*.

### 2. *Google DoubleClick*

121.  DoubleClick for Publishers ("DoubleClick"), now also known as Google Ad Manager, allows website owners to monetize their websites by selling ad space within their websites.[64] DoubleClick connects website owners with advertisers who want to buy ad space within the owners' website, and allows advertisers to track the performance of their ads across websites.[65] DoubleClick acts as a liaison between a website owner's ad inventory, relevant ad networks, and advertisers that are looking to purchase ad space on a website.[66]

122.  DoubleClick works in a similar way to Google Ads in that it allows companies to buy impressions through the DoubleClick Ad Exchange.[67] DoubleClick can be thought of as a marketplace used for large-scale advertising as the DoubleClick Ad Exchange as it connects advertisers, agencies, publishers, supply-side platforms, and demand-side platforms.[68]

123.  The process for DoubleClick works as follows: (i) a website operator signs up for the platform by creating a Google Ad Manager account;[69] (ii) a third-party advertiser then creates an ad campaign using Google AdWords, which includes

---

[64] Shubham Grover, *DFP Glossary: An Easier Explanation for All the Jardon*, ADPUSHUP (Dec. 10, 2022), https://www.adpushup.com/blog/dfp-glossary-easier-explanation-jargon/ (last visited Feb. 26, 2025).

[65] *Id.*

[66] Brock Munro, *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT (Dec. 1, 2024), https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited Feb. 26, 2025).

[67] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en (last visited Feb. 27, 2025).

[68] *See What is an ad exchange? Learn how they work*, AMAZON ADS, https://advertising.amazon.com/library/guides/ad-exchange (last visited Feb. 27, 2025).

[69] Munro, *supra* note 68.

ad creatives, targeting options, and bid strategies; (iii) the advertiser then submits the ad to DoubleClick where it is reviewed and approved;[70] (iv) once approved, the website owner can put the ad on the DoubleClick Ad Exchange to find a buyer for the ad space.[71]

124.    Once implemented by the website operator, such as Defendants, when Users or Subscribers visit a webpage with a DoubleClick Ad, the user experiences the web page on their browser as an integrated collage of text and images. A DoubleClick Ad, as displayed on the PCWorld Website, is depicted below.



---

[70]    *See About the ad review process*, GOOGLE, https://support.google.com/google-ads/answer/1722120?hl=en (last visited Feb. 26, 2025).
[71] Grover, *supra* note 66.

*Figure 16 – DoubleClick Ad Banner on PCWorld Website*

125. However, the content delivered to each webpage is, in reality, aggregated from multiple independent sources. The website owner leaves part of its webpage blank where the third-party advertisements will appear. When a website receives a request from a user visiting a particular webpage, the server for that webpage will respond to the browser, instructing the browser to send a request to the third-party company charged with serving the advertisements for that particular webpage. The third-party's advertising server responds to the user's request by sending the advertisement to the user's browser, which then displays it on the user's device. This entire process occurs within milliseconds and the third-party content appears to arrive simultaneously with the first-party content so that the user does not discern any separate GET requests from the third-parties.

126. Additionally, DoubleClick tracks the performance of ads and provides data such as impressions, clicks, and conversions to the advertiser. That information is then used to further optimize advertising campaigns. The DoubleClick's ad server uses targeting and bidding algorithms to determine which ad to display, based on factors such as the user's location, browsing history, and interest.[72]

---

[72] Joanna Geary, *DoubleClick (Google): What is it and what does it do?*, THE GUARDIAN (Apr. 23, 2012 12:08 PM), https://www.theguardian.com/technology/2012/apr/23/doubleclick-tracking-trackers-cookies-web-monitoring (last visited Feb. 26, 2025).

127.    Defendants send this information, including Users' search terms, to Google via the URL doubleclick.net as depicted below.



*Figure 17 – Using PCWorld Website's Search Bar results in DoubleClick intercepting and obtaining search terms*

128.    The bidding system is similar to the Google Ads system. The benefits provided to Google from DoubleClick Ads are also similar to those provided by Google's search ads. First, Google Ad Manager has various fee structures that can be utilized including a percentage of spend plus a flat monthly fee; a flat monthly fee or percentage of spend, whichever is higher or a flat fee percentage based on the amount you spend every month.[73] Regardless of the structure, Google earns revenue

---

[73] Joe Balestrino, *How Much Does Google Ads Management Cost?*, JOE BALESTRINO (Feb. 17, 2023), https://www.joebalestrino.com/how-much-does-google-ads-management-cost (last visited Feb. 26, 2025).

from allowing website owners to utilize its code to display ads purchased from the DoubleClick Ad Exchange.

129.    Google also aggregates data on what users are clicking on the website owner's sites to further improve their algorithms, develop their own products, and further drive revenue.[74]

130.    The Websites, including the PCWorld Website, allow Google to integrate DoubleClick advertisements into their Websites to further monetize their Users. The website owner, here Defendants, receives money for selling the ad space on their Website, thus, directly benefitting from the DoubleClick implementation.

131.    As the designer, programmer, and controller of the Websites, including the PCWorld Website, Defendants implemented the Google Programmable Search Engine ("PSE") into the Websites. The implementation of the Google PSE allows Users to search the Websites for relevant results. The Websites' use of the Google PSE in conjunction with Google AdSense allows the Defendants, as the site owners, to receive a share of the revenue that Google receives from the AdSense ads placed

---

[74] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited Feb. 26, 2025).

within the Website's search results.[75] Users using the search function on the Website see sponsored ads—which, in reality, are Google AdSense ads—which appear above or below the organic Google search results, as depicted below.



*Figure 18 – Using Search Bar on PCWorld Website yields advertised links*

132.    As explained above, AdSense ads are based on the Google Ads bidding process. In connection with searches using AdSense, publishers, such as Defendants, receive 51 percent of the revenue recognized by Google.[76]

---

[75] *AdSense revenue share*, GOOGLE, https://support.google.com/adsense/answer/180195?hl=en (last visited Feb. 26, 2025).
[76] *Id.*

49

### 3. *Google Analytics*

133.    Like the Facebook Pixel, Google Analytics ("GA") collect data about user interactions with a website, including: link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[77]

134.    The data collected through GA is sent back to Google, which associates the activity with the website it was collected from.[78] Notably, Google notifies web developers that developers should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[79]

135.    In short, the use of GA represents specific data collection practices and settings and pre-determined destinations for that data. Google itself is aware of the

---

[77] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH: BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited Feb. 26, 2025).
[78]    *Tag    Manager    Help:    About    the    Google    Tag*,    GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Feb. 26, 2025).
[79] *Id.*

potential legal violations its data collection tools are capable of, and puts the onus of warning users onto the website developers, such as Defendants.

136.    Here, Defendants added GA to the Websites, which resulted in the interception and redirection of Plaintiff's search terms to Google, as depicted from the example taken directly from the PCWorld Website below.



*Figure 19 – Test search made on the PCWorld Website resulted in Google Analytics intercepting and redirecting search terms "GPU Battle" with Google*

137.    After arriving at those common destinations, the Google products provide analysis and feedback which help the Defendant to monetize the collected information through targeted advertising.

## V.    The Websites Lack Informed, Written Consent Pursuant to the VPPA

138.    The Websites do not seek nor obtain permission from Subscribers, including Plaintiff and the Class, to share the Subscribers' PII or web watching history with third parties, including Facebook.

139.    The sign-up process for subscriptions to the Websites' Newsletters or Digital Magazines does not seek or obtain informed, written consent.

140.    To the extent information about any of the Websites' data sharing can be located, the language is not (i) presented to Subscribers of the site in a transparent manner, or where it must be viewed by Visitors to the websites; (ii) made available as part of the sign-up process; (iii) offered to subscribers as checkbox or e-signature field, or as any form of consent; and (iv) presented in terms that sufficiently warn subscribers that their information, protected by the VPPA, will be shared with Facebook.[80]

---

[80] *See Privacy Policy*, PCWORLD, https://www.pcworld.com/about/privacy (last visited Feb. 26, 2025).

## VI.    Plaintiff Did Not Consent to Defendants' Sharing of Plaintiff's Search Terms

141.    Plaintiff was unaware of the Pixel's, and other Tracking Tools', interception of his confidential communications with the Websites. The absent Class and Subclass Members were equally unaware of the Tracking Tools intercepting their confidential communications with the Websites.

142.    Plaintiff reasonably believed that communications to the Websites were made in confidence. Absent Class and Subclass Members held the same expectation in connection with their own communications between themselves and the Websites.

143.    With no notice or warning as to who was intercepting and decoding the contents of his communications, Plaintiff was not provided notice of or given an opportunity to provide consent to the Tracking Tools' interceptions of Plaintiff's search terms.

144.    Meta and Google, by way of example, guide and caution website operators of the dangers of using their Tracking Tools without first providing notice of and then obtaining valid consent for invasively collecting consumers' protected data and either making that data available to third-parties or allowing third parties

53

to intercept consumers' protected information.  Defendants agreed to these terms, in order to utilize and employ the Tracking Tools.

145.    In contravention to Meta's and Google's terms and guidance, Plaintiff was not given notice of the use of the Tracking Tools on the Websites.

146.    As a result, Plaintiff did not and could not provide consent to the collection and sharing of his data when visiting the Websites, running searches on the Websites, and requesting videos from the Websites.

### VII.    Plaintiff Has a Privacy Right in his Search Terms

147.    As Senator Leahy aptly foresaw, the time has come where companies can easily build profiles of customers based on their consumer habits.

148.    Communications shared between consumers and companies appear to be private but, in reality, the contents of those messages are regularly shared.

149.    Here, Defendants share consumers' information, including search terms, with the Tracking Entities.

150.    Search terms are inherently private. This is particularly true when the searches are communicated in confidence, or presumed to be private. All search terms are personal in nature, but there is an obviously heightened want for the

searches to be kept confidential when the search terms themselves contain private information.

151. As described in Section I, descriptions and summaries of requested pre-recorded audio visual materials are private information worthy of federal protection.

152. Users search for video materials on the Websites using search terms. The search terms, when associated with descriptions or summaries of the pre-recorded videos, pertain to more than Users' basic privacy.

153. This private information is then shared with various third parties, including the Tracking Entities.

## TOLLING

154. The statutes of limitations applicable to Plaintiff's and the Classes' claims were tolled by Defendants' conduct and Plaintiff's and Class and Subclass Members' delayed discovery of their claims.

155. As alleged above, Plaintiff and members of the Classes did not know and could not have known when they used the Websites that Defendants were disclosing their information and communications to third parties. Plaintiff and

members of the Classes could not have discovered Defendants' unlawful conduct with reasonable diligence.

156.    Defendants secretly incorporated the Tracking Tools into the Websites, providing no indication to consumers that their communications would be disclosed to these third parties.

157.    Defendants had exclusive and superior knowledge that the Tracking Entities' Tracking Tools incorporated on its Website would disclose consumers' protected and private information and confidential communications, yet failed to disclose that by interacting with the Website, Plaintiff's and Class and Subclass Members' PII would be disclosed to third parties.

158.    Plaintiff and members of the Classes could not with due diligence have discovered the full scope of Defendants' conduct because the incorporation of the Tracking Entities' Tracking Tools is highly technical and there were no disclosures or other indication that would inform a reasonable consumer or Website user that Defendants were disclosing and allowing the interception of such information to these third parties.

159.    The earliest Plaintiff and Class and Subclass Members could have known about Defendants' conduct was in connection with their investigation and the work done on their behalf in preparation of filing of this Complaint.

## CLASS ACTION ALLEGATIONS

160.    Plaintiff brings this action individually and on behalf of the following Classes:

161.    All Users of the Websites that had their PII, search terms, subscriptions and detailed webpage information improperly intercepted by the Websites and disclosed to Facebook through the use of the Pixel (the "Class").

162.    Specifically excluded from the Class is Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

163.    Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

164.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

165.    Numerosity (Rule 23(a)(1)): At this time, Plaintiff did not know the exact number of members of the aforementioned Class. However, given the popularity of Defendants' Websites, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

166.    Typicality of Claims (Rule 23(a)(3)): Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, subscribed to, and used, the Websites to stream videos, and had his PII collected and disclosed by Defendants.

167.    Adequacy of Representation (Rule 23(a)(4)): Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has no interests antagonistic to, nor in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

168.    Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the

monetary damages suffered by individual Class Members is relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

169.    Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

a. Whether Defendants collected Plaintiff's and the Class's Sensitive Information;

b. Whether Defendants unlawfully disclosed and continue to disclose the PII of Subscribers of the Websites in violation of the VPPA;

c. Whether Defendants' disclosures were committed knowingly; and

d. Whether Defendants disclosed Plaintiff's and the Class's Sensitive Information without consent.

170. Information concerning the Websites' data sharing practices and subscription members is available from Defendants' or third-party records.

171. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

172. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

173.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

174.    Given that Defendants' conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

# CAUSES OF ACTION

## COUNT I
## VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
## 18 U.S.C. § 2710, et seq.
### (On behalf of Plaintiff and the Class)

175.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth in all preceding paragraphs of this Complaint as though fully set forth herein.

176.    Plaintiff brings this count on behalf of himself and all members of the Class.

177.    The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

178.    Defendants violated this statute by knowingly disclosing Plaintiff's and other Class Members' personally identifiable information to Facebook.

179.    Defendants, through the Websites, engage in the business of delivering video content to Subscribers, including Plaintiff and the other Class Members, and other users.  The Websites deliver videos to subscribers, including Plaintiff and the

other Class Members, by making those materials electronically available to Plaintiff and the other Class Members on the Websites.

180.    "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

181.    A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

182.    Defendants are each a "video tape service provider" because they curate, host, provide access to, and cause the delivery of thousands of videos on the Websites, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

183.    Defendants solicit individuals to subscribe to their Newsletters to unlock access to content published or produced by Defendants.

184. Plaintiff and members of the Class are "consumers" because they watched videos on the Websites, signed up for Newsletters and/or paid money for Digital Magazines subscription directly. 18 U.S.C. § 2710(a)(1).

185. Plaintiff and the Class Members searched for and/or streamed videos using the Websites.

186. Defendants disclosed Plaintiff's and the Class Members' PII to Facebook. Defendants utilized the Pixel which forced Plaintiff's web browsers to transfer Plaintiff's identifying information, like his FID, along with Plaintiff's event data, like the titles of the videos they searched for or streamed.

187. Defendants knowingly disclosed Plaintiff's PII, which is triggered automatically through Defendants' use of the Pixel. No additional steps on the part of the Defendants, Facebook, or any third-party are required. And, once the Pixel's routine exchange of information is complete, the FID that becomes available can be used by any individual to easily identify a Facebook user, by simply appending the FID to www.facebook.com (e.g., www.facebook.com/[FID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, along with all the information contained in or associated with that profile page.

64

188. The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that person has provided "informed written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

189. Plaintiff and Class Members did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to Facebook. Defendants failed to obtain "informed, written consent" from Subscribers – including Plaintiff and Class Members – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

190. Defendants' use of Plaintiff's and Class Members' PII for marketing purposes was also prohibited. PII may be disclosed "for the exclusive use of marketing goods and services directly to the consumer" only where "the disclosure is solely of the names and addresses of consumers *and* . . . the disclosure does not

identify the title, [or] description, . . . of any . . . audio visual material[.]" 18 U.S.C. § 2710(b)(2)(D); (b)(2)(D)(ii) (emphasis added). Here, Defendants did disclose Plaintiff's and Class Members' PII, including video search titles, for solely marketing purposes.

191.    Defendants' disclosure of Plaintiff's and Class Members' PII was not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendants' disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

192.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendants failed to provide an opportunity to opt out as required by the VPPA.

193.    On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief as to Defendants; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for

each violation of the VPPA pursuant to 18 U.S.C. § 2710(c) as to Defendants; and

(iv) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT II
### VIOLATION OF COMMON LAW INVASION OF
### PRIVACY Intrusion Upon Seclusion
### (On Behalf of Plaintiff and the Class)

194.    Plaintiff incorporates by reference and re-alleges each and every

allegation set forth in all preceding paragraphs of this Complaint as though fully set

forth herein.

195.    Plaintiff brings this claim individually and on behalf of the members

of the proposed Class against Defendants.

196.    Plaintiff and Class Members maintained a reasonable expectation of

privacy in their communications with Defendants via their Websites. Users' search

terms, browsing history, geolocation data, and website activity have been

recognized by society as sensitive information.[81]

197.    Plaintiff's and Class Members' reasonable expectation of privacy is

---

[81] For example, California voted to pass the California Consumer Privacy Act of 2018, and voted to amend it in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that colling and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally* Cal. Civ. Code §§1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

supported by the VPPA's recognition that PII is sensitive information that must be protected from unauthorized disclosure.

198.    Plaintiff and Class Members maintained a reasonable expectation of privacy believing that Defendants would not share their Sensitive Information with Meta, as a VTSP, because Defendants were under a duty to not share such information with Meta unless Defendants had explicit authorization to do so.

199.    Plaintiff and members of the Class have an interest in: (i) precluding the dissemination and/or misuse of their sensitive and confidential information; and (ii) being free to search for and consume audio video materials without observation, intrusion or interference, including, but not limited to, the right to visit and interact with internet websites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

200.    Plaintiff and Class Members possessed a reasonable expectation of privacy based on the belief that Defendants would abide by federal law, such as the VPPA and the Wiretap Act. The VPPA prohibits VTSPs—here, Defendants—from disclosing consumers' PII without consent. The Wiretap Act prohibits Facebook from intercepting communications between consumers, such as Plaintiff and the Class, and their VTSPs without consent. Through its placement of Pixel on the

Websites, Defendants enabled the disclosure and interception of Plaintiff's and the Class's PII and communications, and resulting intrusion upon Plaintiff's and Class Members' privacy.

201.    As explained above, Defendants' actions constitute a serious invasion of privacy that was an egregious breach of social norms, such that the breach was highly offensive to a reasonable person because:

i.      the invasion of privacy occurred in a highly sensitive setting – Users' communications with the Defendants;

ii.     Defendants had no legitimate objective or motive in invading Plaintiff's and Class Members' privacy in such a manner;

iii.    Defendants violated multiple laws by invading Plaintiff's and Class Members' privacy, including the Wiretap Act;

iv.     Defendants deprived Plaintiff and Class Members of the ability to control dissemination of their Sensitive Information; and

v.      Defendants' actions are also unacceptable as a matter of public policy because they undermine the relationship between consumers and their video tape service providers.

69

202. Within the relevant time period, by implementing the Pixel on the Websites, Defendants intentionally invaded Plaintiff's and Class Members' privacy rights, and procured Meta to do so.

203. As a direct and proximate result of this infringement upon their privacy, Plaintiff and Class Members sustained harm and experienced various damages. In light of this injury, Plaintiff and Class Members are pursuing suitable remedies, such as compensatory damages, restitution, disgorgement, punitive damages, and any other relief that the Court deems appropriate and fair.

## COUNT III
## VIOLATION OF THE FEDERAL WIRETAP ACT
## 18 U.S.C. § 2510, *et seq*.
### (On Behalf of Plaintiff and the Class)

204. Plaintiff incorporates by reference and re-alleges each and every allegation set forth in all preceding paragraphs of this Complaint as though fully set forth herein.

205. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against the Defendants.

70

206.    Codified under 18 U.S.C. §§ 2510 *et seq.*, the Federal Wiretap Act prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

207.    The Wiretap Act confers a civil private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

208.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

209.    The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

210.    The Wiretap Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

211.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature

transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

212. The Defendants are each a person for the purposes of the Wiretap Act.

213. The Pixel and other Tracking Tools constitute a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

214. The confidential communications Plaintiff and members of the Class had with the Websites, in the form of their Sensitive Information, were intercepted by Facebook and such communications were "electronic communications" under 18 U.S.C. § 2510(12).

215. Plaintiff and members of the Class had a reasonable expectation of privacy in their electronic communications with the Websites in the form of their Search Terms submitted to the Websites and browsing information. Even if Plaintiff and members of the Class would not have had reasonable expectation of privacy in the electronic communications normally, Plaintiff's and Class Members' electronic communications with the Websites included descriptions and summaries of the videos they watched, searched for, requested, or subscribed to unlock access to,

72

along with their identifying information, giving rise to a reasonable expectation of privacy pursuant to the VPPA.

216.  Plaintiff and members of the Class reasonably expected that third parties were not intercepting, recording, or disclosing their electronic communications with the Websites.

217.  Within the relevant time period, the electronic communications between Plaintiff and members of the Class and the Websites were intercepted by the Pixel the instant they were sent to the Websites, without consent, and for the unlawful and wrongful purpose of monetizing their private information, which includes the purpose of using such private information to develop advertising and marketing strategies.

218.  Interception of Plaintiff's and Class Members' confidential communications with the Websites occur whenever a user uses the search bar within the Websites, and when navigating various webpages of the Websites, including those containing videos.

219.  At all times relevant to this Complaint, Defendants' conduct was knowing, willful, and intentional, as Defendants are each a sophisticated party with full knowledge regarding the functionality of the Pixel and other Tracking Tools,

73

including that allowing the Tracking Tools to be implemented on the Websites would cause the private communications of their Users to be shared with third parties.

220.    Plaintiff and members of the Class were never asked for their consent to expose their confidential electronic communications with the Websites to third parties. Indeed, such consent could not have been given as Meta and Defendants never sought any form of consent from Plaintiff or members of the Class to intercept, record, and disclose their private communications with the Websites.

221.    As detailed above, the Tracking Entities' unauthorized interception, disclosure and use of Plaintiff's and the Class Members' confidential communications was only possible through the Defendants' knowing, willful, or intentional placement of the Tracking Tools on the Websites. 18 U.S. Code § 2511(1)(a).

222.    Plaintiff and members of the Class have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such, Plaintiff and members of the Class are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and members of

the Class and any profits made by Defendants as a result of the violation, or (b)

statutory damages of whichever is the greater of $100 per day per violation or

$10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable

attorneys' fees and other litigation expenses.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

223.    Plaintiff incorporates by reference and re-alleges each and every

allegation set forth in all preceding paragraphs of this Complaint as though fully set

forth herein.

224.    Plaintiff brings this claim individually and on behalf of the members

of the proposed Class against Defendants.

225.    Plaintiff and members of the Class conferred benefits on Defendants

by subscribing to the Websites.

226.    Defendants have been unjustly enriched in retaining the revenues

derived from Plaintiff's and Class Members' subscriptions to the Websites.

227.    Retention of those monies under these circumstances is unjust and

inequitable because Defendants have engaged, and continued to engage, in

systematic privacy violations resulting from the use of Tracking Tools on their Websites. Their use of Tracking Tools caused injuries to Plaintiff and members of the Class because they would not have subscribed to the Websites if they knew that it would result in the unauthorized disclosure of their Sensitive Information to third parties for Defendants' own monetary gain.

228.   Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and members of the Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and members of the Class for its unjust enrichment, as ordered by the Court.

**Injunctive Relief of Defendants' Ongoing VPPA and Wiretap Violations**

229.   An actual and immediate controversy has arisen and now exists between Plaintiff and the putative Class he seeks to represent, and Defendants, which parties have genuine and opposing interest in and which their interests are direct and substantial. Defendants have violated, and continue to violate, Plaintiff's rights to protection of his PII under the VPPA.

230.   Plaintiff demonstrated that he is likely to succeed on the merits of his claims and thereby is entitled to declaratory and injunctive relief.

231.    Plaintiff has no adequate remedy at law to stop the continuing violations of the VPPA by Defendants. Unless enjoined by the Court, Defendants will continue to infringe on the privacy rights of Plaintiff and the absent Class Members and will continue to cause, or allow to be caused, irreparable harm to Plaintiff. Injunctive relief is in the public interest to protect the PII of Plaintiff and other consumers that would be irreparably harmed through continued disclosure of their PII.

232.    Defendants disregard its obligation under the VPPA by installing the Tracking Tools, including the Pixel, onto the Websites and facilitating the sharing of Subscribers' PII with third parties for any ordinary person to access and use.

233.    Despite brazenly violating the VPPA, Users were provided with no notice of the employment of the Pixel and no indication of how or how much of their information was shared with third parties. Worse, in further violation of the VPPA, Defendants did not seek or obtain any form of consent from Users for the use of the Tracking Tools to share information improperly obtained from the Websites.

234. This threat of injury to Plaintiff from the continuous violations requires temporary, preliminary, and permanent injunctive relief to ensure his PII is protected from future disclosure without adequate notice and consent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Class and his counsel as Class Counsel;

(b) For an order declaring that the Defendants' conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendants to immediately (i) remove the Tracking Tools from the Websites or (ii) add, and obtain, the appropriate consent from Users;

(e) For damages in amounts to be determined by the Court and/or jury;

(f) An award of statutory damages or penalties to the extent available;

(g) For Defendants to pay $2,500.00 to Plaintiff and each Class Member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h) For pre-judgment interest on all amounts awarded;

(i)     For an order of restitution and all other forms of monetary relief;

(j)     An award of all reasonable attorneys' fees and costs; and

(k)     Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: April 18, 2025                    By: /s/ *H. Clay Barnett, III*

H. Clay Barnett, III (GA Bar No. 174058)
Overlook II
**BEASLEY, ALLEN, CROW,**
 **METHVIN, PORTIS & MILES, P.C.**
2839 Paces Ferry Road SE, Suite 400
Atlanta, Georgia 30339
Clay.Barnett@Beasleyallen.com

J. Mitch Williams*
**BEASLEY, ALLEN, CROW,**
 **METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
T: 334-269-2343
Mitch.Williams@Beasleyallen.com

**LEVI & KORSINSKY, LLP**

79

Gary S. Ishimoto*
Mark S. Reich*
Courtney E. Maccarone*
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: gishimoto@zlk.com
Email: mreich@zlk.com
Email: cmaccarone@zlk.com

*Counsel for Plaintiff*

**pro hac vice* forthcoming

## CERTIFICATE OF COMPLIANCE

I hereby certify, in compliance with Local Rule 5.1(c), that the foregoing has been prepared using 14-point Times New Roman font.

/s/ H. Clay Barnett, III
H. Clay Barnett, III (GA Bar No. 174058)

81